IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

PAMELA BORTON,                              )
                                            )
                 Plaintiff,                 )
          v.                                )      CASE NO. 1:08-CV-654-WKW [WO]
                                            )
THE CITY OF DOTHAN, a municipality,         )
*et al.*,                                   )
                                            )
                 Defendants.                )

## MEMORANDUM OPINION AND ORDER

### I.  INTRODUCTION

In this lawsuit, Plaintiff Pamela Borton claims that an officer with the Dothan Police Department unlawfully tased her three times while she was strapped to a gurney, after she had been transported involuntarily by an ambulance to a medical center for mental health treatment, and that another officer failed to prevent the tasing.  She brings this action against Jeff Schulmerich and Jason Weed, individually and in their official capacities as officers employed by the Dothan Police Department; John R. Powell, in his official capacity as the chief of police; and the City of Dothan.  Ms. Borton alleges 42 U.S.C. § 1983 claims against Defendants for alleged violations of her Fourth, Fifth and Eighth Amendment rights, as well as various state law claims.  Her claims arise from both the actions of the individual officers and the policies and customs of the Dothan Police Department, which is run by the City of Dothan.

Before the court is Defendants' motion for summary judgment (Doc. # 66), which is accompanied by a memorandum and an evidentiary submission.  (Docs. # 66, 67.)  Ms. Borton filed a response in opposition and an evidentiary submission, to which Defendants replied.  (Docs. # 73, 74.)  After careful consideration of the arguments of counsel, the applicable law and the record as a whole, the court finds that the motion is due to be granted in part and denied in part.

## II.  JURISDICTION AND VENUE

The court properly exercises subject matter jurisdiction over this action, pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), 28 U.S.C. § 1343 (civil rights jurisdiction), and 28 U.S.C. § 1367 (supplemental jurisdiction).  Personal jurisdiction and venue are adequately pleaded and not contested.

## III.  STANDARD OF REVIEW

"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  *Greenberg v. BellSouth Telecomms., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (*per curiam*) (citation and internal quotation marks omitted); *see* Fed. R. Civ. P. 56(c) (Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.").  The party moving for summary judgment "always bears the initial responsibility of informing the district court of

the basis for its motion, and identifying those portions of [the record, including pleadings, discovery materials and affidavits], which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant may meet this burden by presenting evidence indicating there is no dispute of material fact or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322-24.

If the movant meets its evidentiary burden, the burden shifts to the nonmoving party to establish, with evidence beyond the pleadings, that a genuine issue material to each of its claims for relief exists. Fed. R. Civ. P. 56(e)(2); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). What is material is determined by the substantive law applicable to the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Lofton v. Sec'y of the Dep't of Children & Family Servs.*, 358 F.3d 804, 809 (11th Cir. 2004) ("Only factual disputes that are material under the substantive law governing the case will preclude entry of summary judgment."). Furthermore, "[t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003) (*per curiam*) (citation and internal quotation marks omitted).

A genuine issue of material fact exists when the nonmoving party produces evidence that would allow a reasonable fact-finder to return a verdict in its favor. *Greenberg*, 498 F.3d at 1263; *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001). However, if the evidence on which the nonmoving party relies "is merely colorable, or is not

3

significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 242 (citations omitted). "A mere 'scintilla' of evidence supporting the [nonmovant's] position will not suffice; there must be enough of a showing that the [trier of fact] could reasonably find for that party," *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990), and the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Conclusory allegations based on subjective beliefs are likewise insufficient to create a genuine issue of material fact and do not suffice to oppose a motion for summary judgment. *Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997) (*per curiam*) (A plaintiff's "conclusory assertions . . . in the absence of supporting evidence, are insufficient to withstand summary judgment."). Hence, when a plaintiff fails to set forth specific facts supported by appropriate evidence sufficient to establish the existence of an element essential to his case and on which the plaintiff will bear the burden of proof at trial, summary judgment is due to be granted in favor of the moving party. *Celotex Corp.*, 477 U.S. at 323 ("[F]ailure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.").

Thus, in cases where the evidence before the court is admissible on its face or can be reduced to admissible form and indicates there is no genuine issue of material fact, and where the party moving for summary judgment is entitled to it as a matter of law, summary judgment is proper. *Celotex Corp.*, 477 U.S. at 323-24 (summary judgment appropriate

where pleadings, evidentiary materials and affidavits before the court show there is no genuine issue as to a requisite material fact).

## IV. FACTS[1]

While the material facts surrounding the tasing are hotly contested, at this juncture, Plaintiff Pamela Borton's ("Borton") version of the events occurring on August 15, 2006, is credited.[2]

Ms. Borton suffers from bipolar disorder, and on August 15, 2006, she was at her home in Midland City, Alabama, in an unmedicated "manic state."[3]  (Pl. Dep. 18, 19, 26-27.) When she is in a manic state, she loses touch with reality and has no sense of time; "hours run into days, days run into weeks."  (Pl. Dep. 19, 20.)  Ms. Borton feels like she can "conquer the world" and exhibits symptoms of grandiosity.  (Pl. Dep. 19.)  On this particular day, it is not clear exactly what type of behavior Ms. Borton was exhibiting.  It is undisputed,

---

[1] The actual facts may be different than those stated here.  *See Lee v. Ferraro*, 284 F.3d 1188, 1190 (11th Cir. 2002) ("[F]acts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case.  Nevertheless, for summary judgment purposes, [the] analysis must begin with a description of the facts in the light most favorable to the plaintiff.") (citation and internal quotation marks omitted)).

[2] Officer Schulmerich and Officer Weed have relied on their version of the facts in urging summary judgment.  They contend that because on August 15, 2006, Ms. Borton "was mentally unstable and was suffering a manic episode," her ability to recall what actually happened is impaired and "highly suspect."  (Defs. Summ. J. Br. 2; Defs. Reply 2.)  This may be so, but Defendants have not presented any authority that Ms. Borton's testimony can be ignored at summary judgment.  To adopt Defendants' position would require an impermissible credibility assessment.  *See Moorman v. UnumProvident Corp.*, 464 F.3d 1260, 1267 n.1 (11th Cir. 2006) ("Credibility determinations at the summary judgment stage are impermissible.").  It will be for the jury to decide whether Ms. Borton's version is fact or fiction.  At this stage, Ms. Borton's facts must govern.

[3] According to medical records, Ms. Borton was fifty years old on August 15, 2006.  (Pilcher Ambulance Service Patient Care Report Form (Ex. 4 to Doc. # 67).)  She was diagnosed with bipolar disorder more than twenty years prior to that date.  (Debra Whitfield Dep. 7, 56.)

however, that her behavior ultimately resulted in a 911 call by a family member.[4] (Pl. Dep. 22-23.)

Paramedics and Midland City, Alabama, police officers responded to the call, arriving at Ms. Borton's residence between 2:00 p.m. and 2:30 p.m. on August 15. The paramedics intended to transport Ms. Borton to Southeast Alabama Medical Center ("SAMC"), the closest facility with a mental health ward, to be admitted as a patient for mental health treatment. (Alex Watson Dep. 14.) She did not want to go to the hospital or leave her house, and she refused to go with the paramedics. (Pl. Dep. 27; Whitfield Dep. 11.) At some point during the paramedics' coaxing, Ms. Borton "broke and ran" from the house, and held onto a tree in the front yard. (Whitfield Dep. 14; Pl. Dep. 26.) One of the officers described Ms. Borton as "agitated and confused," and reported that, notwithstanding her petite build,[5] it took two police officers and two paramedics to restrain her "due to her extremely violent resistance." (Bradley Shaw Aff. 2.) Finally, after about fifteen minutes of intense struggle, Ms. Borton was secured face down to a gurney. (Pl. Dep. 27, 29; Whitfield Dep. 14; Watson Dep. 17.) Her wrists were handcuffed on each side of the gurney, and her legs were

---

[4] Debra Whitfield, Ms. Borton's sister, came to Ms. Borton's residence after learning of the 911 call. Ms. Whitfield testified that Ms. Borton's home was in disarray. Items were "[s]trung" and "strewed." (Whitfield Dep. 66.) "[T]hings [were] pushed out of the way, things turned the wrong way, things pulled out of the cabinets." (Whitfield Dep. 66.) "Clothes [were] everywhere." (Whitfield Dep. 66.)

[5] Ms. Borton is described as "skinny," weighing around 120 pounds. (Alex Watson Dep. 17; McNeal Dep. 32.)

restrained with "sheets and straps."[6]  (Pl. Dep. 29.)  In the ambulance while secured to the gurney, Ms. Borton "continued to struggle violently, kicking and screaming." (Shaw Aff. 2.)

The ambulance ride from Midland City to SAMC took between ten and fifteen minutes.[7]  (Watson Dep. 20.)  Upon arriving at SAMC's emergency room entrance, Ms. Borton was removed from the ambulance, still secured face down to the gurney.[8]  Also on the scene were Dothan Police Officers Jeff Schulmerich ("Schulmerich"), Jason Weed ("Weed") and a third officer,[9] who had been dispatched to SAMC to assist the ambulance personnel with a "disorderly patient."  (Schulmerich Aff. 2; Weed Dep. 9.)  At this time, Ms. Borton was loud and boisterous.  (Pretrial Order 4 (Pl. Contentions).)

Officers Schulmerich and Weed were walking alongside the gurney.  (Pl. Dep. 76; Watson Dep. 38.)  As Ms. Borton was wheeled into the emergency room still strapped to the

---

[6] Ambulance personnel testified that her ankles were secured with Posey restraints.  Posey restraints consist of "a long piece of webbing, with a foam piece attached."  (Watson Dep. 59-60.)  The foam pieces and webbing wrap around the ankle, and are secured with buckles.  (Watson Dep. 59-60, 63.)

[7] The Midland City police officers did not accompany Ms. Borton to the hospital, and they are not defendants in this action.  Ms. Borton does not contend that they used unreasonable force to subdue her prior to her transport in the ambulance.  (Pl. Dep. 79.)

[8] There is evidence that, while in transport, Ms. Borton broke free from the Posey restraints on her ankles, but that the restraints were back in place before the ambulance reached SAMC.  (Watson Dep. 19.)  During the ambulance ride, paramedics also wrapped sheets around the gurney and Ms. Borton's waist area to "keep her from bucking."  (Watson Dep. 19.)

[9] Officers Schulmerich and Weed are named Defendants.  The complaint's caption also names "a third unknown officer."  (Am. Compl. 1 (Doc. # 35).)  Ms. Borton has never moved to amend the complaint to name the real party in interest, and the deadline for doing so has long expired.  This "third unknown officer," thus, has not been identified in the complaint or served with process.  Counsel for Ms. Borton confirmed at the pretrial hearing that he was not pursuing claims against this officer; however, even if Ms. Borton requested leave to amend the complaint at this late date, leave would be denied on the grounds of undue delay and prejudice to Defendants.

gurney, Officer Schulmerich, without warning, tased her on her right leg.  (Pl. Dep. 31, 36, 76.)  Officer Schulmerich deployed the taser in the "drive stun" mode.  In this mode, the probe cartridge on the front of the taser is removed and the taser is applied directly to the subject's skin.  The electrical pulse cycles automatically for five seconds, longer if the trigger is held down or shorter if the taser is turned off or removed from the skin.  Officer Schulmerich did not tase Ms. Borton for the full five seconds.  (Schulmerich Aff. 3; Franklin Bissett Dep. 22-23.)

Ms. Borton was screaming, but not cursing, when she was wheeled into the hospital examination room.  She was pleading, "Don't leave me here with five men."  (Pl. Dep. 36, 39.)  These men (actually there were no less than six) were the ambulance personnel, Officer Schulmerich, Officer Weed, the third officer, Joseph McNeal (SAMC's clinical coordinator), and at least one other hospital employee.  (McNeal Dep. 4-7.)  Officer Schulmerich was standing at the "foot to midway up" the gurney.  (McNeal Dep. 15.)  Officer Weed was at the head of the bed trying to hold down Ms. Borton's head and shoulders.  (Weed Aff. 2-3; Schulmerich Aff. 2; *see also* Watson Dep. 60-61 (testifying that one officer was at the head of the gurney, and the other was standing at the side of the gurney at Ms. Borton's waist area).)

When Ms. Borton's screams turned to coughing, Officer Weed for "no reason" said that if she "spit on him," he would "knock [her] out," and he "drew his fist back . . . over his head."  (Pl. Dep. 39.)  Again with no warning, Officer Schulmerich tased Ms. Borton a second time, while she was still tied down to the gurney.  (Pl. Dep. 34.)  He tased her left leg

8

"so long that it burned it so bad that [she] thought she was being electrocuted."  (Pl. Dep. 34, 36.)  She "was screaming, . . . 'I give up,'" and  "pleading with him to stop."  (Pl. Dep. 34.)  She estimated that this second tasing lasted "well over a minute."  (Pl. Dep. 34.)

The details are sparse as to the third tasing, but Ms. Borton testified that Officer Schulmerich tased her again, this time in the face, and that she lost consciousness.  When tased this third time, she still was strapped to the gurney.  (Pl. Dep. 152.)  The three tasings took place within a span of five to ten minutes.[10]  (Pl. Dep. 69.)

The medical records indicate that the areas of Ms. Borton's skin contacted by the taser were "sore" and "bruised."  (Medical Records (Ex. 7 to Doc. No. 67).)  Ms. Borton also has submitted photographs, taken close in time to the tasing, showing red marks on her legs and on the left side of her face.  (Pl. Dep. 84, 106; Pl. Ex. 3.)  Furthermore, Ms. Borton testified at her deposition that she has a permanent red scar on the end of her nose "where the electric current went through."  (Pl. Dep. 84.)   Her sister, Debra Whitfield ("Whitfield"), corroborates that Ms. Borton's right leg was "burn[ed]" and that Ms. Borton's nose was not scraped when Ms. Borton was placed in the ambulance.  (Whitfield Dep. 67, 73.)  In addition

---

[10] There is no dispute that Officer Schulmerich tased Ms. Borton.  What is in dispute is how many times and whether Ms. Borton was restrained.  Officer Schulmerich denies tasing Ms. Borton while she was being transported on the gurney into the emergency room or while she was secured to the gurney.  Rather, Officer Schulmerich says that he tased her twice in an SAMC examination room, after her restraints had been removed so that she could be transferred to a bed.  (Schulmerich Aff. 2.)  At that point, he says she was violent, "hitting, kicking, and attempting to bite the officers and medical staff," and that he issued three oral warnings that he would use his taser if she did not calm down.  (Schulmerich Aff. 2.)  After the first tasing, which had "little apparent [e]ffect," Ms. Borton continued to "fight and kick."  At that point, Officer Schulmerich says he tased her a second time.  (Schulmerich Aff. 2.)  The second tasing permitted sufficient time to move Ms. Borton to a hospital bed and place her in four-point restraints.  (Schulmerich Aff. 3-4.)  Officer Schulmerich denies tasing her in the face and says that she never lost consciousness.  (Schulmerich Aff. 2; *see also* generally Pretrial Order 12-13.)

to her physical injuries, Ms. Borton attends "mental therapy," and says that the tasing "still haunts [her]" and that she now has a "fear" of law enforcement officers.  (Pl. Dep. 107.)

The Dothan Police Department's tasers contain a computer chip, which when downloaded on a computer show the date, time, and duration for each use of the taser. (Bissett Dep. 33.)  The readout on Officer Schulmerich's taser, however, "malfunction[ed]." (Donnie Smith Dep. 5.)  While the Dothan Police Department shipped the taser to the manufacturer for troubleshooting, it has yet to be returned.  (Smith Dep. 7.)  There is, thus, no electronic printout in the record of the taser's activation on August 15, 2006.

The policies and procedures in place at the Dothan Police Department, which is operated by the City of Dothan ("City"), also are at issue.  The Dothan Police Department has an officer training division, and its officers are certified by the Alabama Peace Officers Standard and Training Commission ("APOSTC").  As of 1995, all police officers in the state of Alabama must receive a minimum of twelve hours training annually, pursuant to § 32-21-57 of the Alabama Code, to remain certified by the APOSTC.  Officers with the Dothan Police Department also receive annual training in addition to the required twelve hours. (Tommy Martin Aff. 2.)  In particular, Officer Schulmerich and Officer Weed have met or exceeded the training requirements set by the state of Alabama to maintain law enforcement certification.  They also have received satisfactory annual evaluations during their respective nineteen-year and twelve-year tenures with the Dothan Police Department.  (Delvick J. McKay Aff. 2; *see also* Weed Aff. 1; Schulmerich Aff. 1.)

10

The Dothan Police Department also has in place written Procedural General Orders governing the use of force and the use of tasers.  (Mike Etress Aff. 4.)  Both Officer Schulmerich and Officer Weed have been trained on use of force and are certified to carry a taser.  (Greg Benton Aff. 2-3; Martin Aff. 2.)

The Dothan Police Department maintains an Internal Affairs Division that reports directly to the chief of police.  (Benton Aff. 3.)  The Internal Affairs Division investigates complaints and allegations of misconduct involving police officers or police department personnel.  (Etress Aff. 2.)  If it is determined that an officer has violated the City's Personnel Rules or the Procedural General Orders, he or she is subject to discipline pursuant to the Civil Service Act.  If the investigation reveals that the officer has violated federal, state or local laws, he or she is subject to discipline and prosecution by the appropriate authority.  (Benton Aff. 4; Etress Aff. 2.)

As to the complaint against Officer Schulmerich with respect to his use of a taser on her, Ms. Borton's sister (Ms. Whitfield) was the complainant.  (Etress Aff. 2.)  Captain Larry Draughon received the complaint and interviewed Ms. Borton at the Behavioral Medical Unit at SAMC, the nurses who were on duty on August 15, 2006, and the paramedics who transported Ms. Borton to SAMC.  (Draughon Aff. 1-3.)  He then turned over the complaint to the Internal Affairs Division, which conducted an investigation.  The investigation cleared the officers, and then-Chief of Police John R. Powell ("Powell") sent a letter to Ms. Borton, dated November 8, 2006, informing her of the outcome of the investigation.  (Etress Aff. 2; Pl. Ex. G to Doc. # 18.)

11

This lawsuit was commenced on August 12, 2008, against the City, Chief of Police Powell,[11] Officer Schulmerich, and Officer Weed.[12]  The claims in the governing Amended Complaint against these Defendants are as follows: (1) 42 U.S.C. § 1983 ("§ 1983") claim against Officers Schulmerich and Weed in their individual capacities, alleging violations of the Fourth Amendment (seizure without probable cause), Fifth Amendment (deprivation of liberty), and Eighth Amendment (cruel and unusual punishment) (Count I); (2) a state law assault and battery claim against Officers Schulmerich and Weed in their official and individual capacities (Count II); (3) a § 1983 claim against the City alleging that it maintains a policy or custom of failing to investigate adequately citizens' complaints of police misconduct, of failing to "require appropriate in-service training or re-training of officers who were known to have engaged in police misconduct," of failing to provide training that "discourage[s] constitutional violations" (Am. Compl. ¶ 66), and of failing to supervise officers who have engaged in police misconduct (Count III); (4) a state law claim against former Chief of Police Powell and the City for negligent training in the proper use of tasers (Count IV); (5) a state law claim against Chief of Police Powell and the City for negligent supervision of officers with respect to the proper use of tasers (Count V); (6) a state law claim against Chief of Police Powell and the City for negligent retention of officers who have engaged in excessive force (Count VI); and (7) a § 1983 Fourth Amendment claim for

---

[11] Powell was the chief of police during the events at issue in this litigation.

[12] Ms. Borton also sued SAMC, "Joseph" (last name unknown), and Howard Miles, but all claims against these defendants were dismissed with prejudice by stipulation.  (*See* Docs. # 64, 65.)

excessive force against Officer Schulmerich and Officer Weed, presumably in their official and individual capacities, and the City (Count VIII).[13]

Ms. Borton requests compensatory and punitive damages in the amount of $2,000,000, costs to include attorney's fees, an order requiring the City "to initiate and implement programs that provide proper training for employees on the subject of the proper times for the use of 'taser,'" and such other relief as deemed just and proper.  (Am. Compl. 32.)

## V.  DISCUSSION

### A.    42 U.S.C. § 1983 Claims

To establish § 1983 individual liability, Ms. Borton must demonstrate that (1) she was deprived of a right secured by the United States Constitution, and (2) the act or omission causing the deprivation was committed by an individual acting under color of state law. *Wideman v. Shallowford Cmty. Hosp., Inc.*, 826 F.2d 1030, 1032 (11th Cir. 1987).  Because "[t]he doctrine of respondeat superior does not apply in § 1983 cases," *Vineyard v. County of Murray, Ga.*, 990 F.2d 1207, 1211 (11th Cir. 1993), § 1983 liability against a local governmental entity requires an additional element.  "[T]he plaintiff must show that the constitutional deprivation resulted from a custom, policy, or practice of the municipality." *Id.* (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)).  "[P]roof of a single, isolated incident of unconstitutional activity generally is not sufficient to impose municipal liability under *Monell*."  *Id.*

---

[13]   As to some counts, the source of law – state or federal – is unclear in the Amended Complaint. These ambiguities are clarified, however, by Ms. Borton in her summary judgment response brief.  All other counts not mentioned above involve claims against the dismissed Defendants.

The principal focus of the dispute as to Officer Schulmerich's and Officer Weed's liability is whether the evidence demonstrates a violation of rights under the Fourth, Fifth and Eighth Amendments to the United States Constitution and relatedly whether they are entitled to qualified immunity.  As to the City, the arguments focus on whether there is evidence of unconstitutional customs or policies, as would support imposition of municipal liability.

### 1.       *Officers Schulmerich and Weed: Individual Liability (Counts I and VIII)*

Officers Schulmerich and Weed raise the defense of qualified immunity as to the constitutional claims asserted by Ms. Borton against them in their individual capacities.[14] (Defs. Summ. J. Br. 22, 31-34.)   "The doctrine of qualified immunity provides that government officials performing discretionary functions generally are shielded from liability for civil damages" unless they have violated a clearly established constitutional right. *Townsend v. Jefferson Cnty.*, 601 F.3d 1152, 1157 (11th Cir. 2010) (citation and internal quotation marks omitted).   A qualified immunity determination requires evaluation of a multi-part test.  First, a defendant must establish that he or she was acting within his or her discretionary authority as a public employee when the conduct in question occurred.  *Id.* at 1158.  Next, a plaintiff must demonstrate "'that: (1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation.'"  *Id.*

---

[14]  Ms. Borton also sues Officer Schulmerich and Officer Weed in their official capacities.  (Am. Compl. 1-2.)  A claim under § 1983 against a municipal officer in his official capacity is "in actuality," a claim "against the city that the officer represents."  *Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir. 1991); *see also Abusaid v. Hillsborough Cnty. Bd. of County Comm'rs*, 405 F.3d 1298, 1302 n.3 (11th Cir. 2005).  Defendants have not moved for summary judgment on the official capacity aspect of the § 1983 claim against Officer Schulmerich and Officer Weed.  Nonetheless, the parties should be aware that it is the City that is the real defendant as to the § 1983 official-capacity claims.

(quoting *Holloman v. Harland*, 370 F.3d 1252, 1264 (11th Cir. 2004)).  In previous years, this two-step inquiry had to be conducted in order.  That is, the court had to decide whether a right existed (and whether it was violated) before deciding whether it was clearly established.  Now, courts may "'exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first.'"  *Id.* (quoting *Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009)).  In this case, the analysis proceeds in the usual manner.

Ms. Borton makes no argument that Officers Schulmerich and Weed were not acting within their discretionary authority as law enforcement officers during the events at issue.  The burden, thus, shifts to Ms. Borton to show that her clearly established constitutional rights were violated.

### a.      Violation of Constitutional Rights

### i.      Officer Schulmerich

The source of Ms. Borton's constitutional right against excessive force is the Fourth

Amendment, not the Fifth or Eighth Amendments.[15]  *Graham v. Connor*, 490 U.S. 386, 395

(1989).  "[A]ll claims that law enforcement officers have used excessive force . . . in the

course of an arrest, investigatory stop, or *other 'seizure' of a free citizen* should be analyzed

under the Fourth Amendment."  *Id.* at 395 (emphasis added).

The Fourth Amendment's "objective reasonableness" standard governs whether a use

of force is excessive.  *Hadley v. Gutierrez*,  526 F.3d 1324, 1329 (11th Cir. 2008); *see also*

*Lee v. Ferraro*, 284 F.3d 1188, 1197 (11th Cir. 2002).  The reasonableness inquiry requires

the court to "carefully balance 'the nature and quality of the intrusion on the individual's

---

[15] In her Amended Complaint, Ms. Borton alleges that, when she was tased three times, she was subjected to cruel and unusual punishment in violation of the Eighth Amendment.  The Eighth Amendment, however, is inapplicable on these facts because Ms. Borton had not been convicted of a crime, was not a pretrial detainee, and had not been institutionalized for mental disabilities.  *See Dowdell v. Chapman*, 930 F. Supp. 533, 541-42 (M.D. Ala. 1996).  Ms. Borton also alleges that she was deprived of her liberty, in violation of the Fifth Amendment.  The Fifth Amendment restrains the federal government from depriving any person "of life, liberty, or property without due process of law."  U.S. Const. amend. V.  Accordingly, the rights provided by the Fifth Amendment do not apply to the actions of city police officers.

As to the Fourth Amendment, Ms. Borton alleges both "excessive force" (Count VIII) and that there was a "seizure of [her] person, if only for a short period of time, without probable cause" (Count I). (Am. Compl. ¶ 39.)  By the time Officers Schulmerich and Weed had been summoned to SAMC, Ms. Borton already had been seized in the sense that she was tied to a gurney by Midland City police officers. Defendants' only "seizure" of Ms. Borton supported by the record is that of the tasing itself, and no evidence has presented, or argument made, of a separate seizure.  On this record, Ms. Borton's claim that the use of the taser amounted to an unreasonable seizure is subsumed in her claim that the use of the taser was excessive force.  This finding is consonant with Ms. Borton's treatment of her Fourth Amendment claim in her summary judgment brief.  (Pl. Summ. J. Resp. 14-15.)  In sum, the only cognizable § 1983 claim implicated by the Amended Complaint is one under § 1983 for excessive force in violation of the Fourth Amendment, made applicable to the states through the Fourteenth Amendment.

16

Fourth Amendment interests' against 'the countervailing governmental interests at stake.'"
*Oliver v. Fiorino*, 586 F.3d 898, 905 (11th Cir. 2009) (quoting *Graham*, 490 U.S. at 396).
The quantum of force used should be measured against "the severity of the crime at issue,
whether the suspect poses an immediate threat to the safety of the officers or others, and
whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490
U.S. at 396; *see also Oliver*, 586 F.3d at 905.  Additional factors include: "'(1) the need for
the application of force, (2) the relationship between the need and the amount of force used,
(3) the extent of the injury inflicted and, (4) whether the force was applied in good faith or
maliciously and sadistically.'"  *Hadley*, 526 F.3d at 1329 (quoting *Slicker v. Jackson*, 215
F.3d 1225, 1233 (11th Cir. 2000)).

Furthermore, "[n]ot every push or shove, even if it may later seem unnecessary in the
peace of a judge's chambers" violates the Fourth Amendment.  *Graham*, 490 U.S. at 396
(citation and internal quotation marks omitted).  "The calculus of reasonableness must
embody allowance for the fact that police officers are often forced to make split-second
judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the
amount of force that is necessary in a particular situation." *Id.*  Hence, "[u]se of force must
be judged on a case-by-case basis from the perspective of a reasonable officer on the scene,
[instead of] with the 20/20 vision of hindsight." *Vinyard v. Wilson*, 311 F.3d 1340, 1347
(11th Cir. 2002).

In at least two published decisions, the Eleventh Circuit has held that under the totality
of the circumstances test, the use of a taser was not excessive force.  In *Draper v. Reynolds*,

369 F.3d 1270 (11th Cir. 2004), a police officer effectuated an arrest after a traffic stop by the "single use of [a] taser gun" on an unrestrained suspect who was "hostile, belligerent, and uncooperative." *Id.* at 1278. The Eleventh Circuit held that the use of the taser "was reasonably proportionate to the difficult, tense and uncertain situation" the suspect created when he refused multiple times to retrieve documents from his truck cab, accused the officer of harassment, used profanity and "repeatedly yelled." *Id.* "Under the 'totality of the circumstances,' [the officer's] use of the taser gun did not constitute excessive force." *Id.*

In *Mann v. Taser International, Inc.*, 588 F.3d 1291 (11th Cir. 2009), a hysterical and delusional arrestee (apparently high on methamphetamine) was handcuffed and shackled after extreme resistance, but continued to "kick uncontrollably" in the patrol car, shattering a rear window and bending the steel door frame. *Id.* at 1300. The deputy's command to stop went unheeded, and the arrestee started "slamming her head up against the opposite door." *Id*. When the officers opened the rear door furthest from the plaintiff, she "propelled herself out of the open door of the squad car, landing on her head and neck." *Id.* This continued behavior resulted in the deputy tasing the plaintiff three times. *Id.* An hour-and-a-half later, she died at a hospital after suffering cardiac arrest. *Id.* at 1301. The administratrix of the arrestee's estate and survivors brought a § 1983 excessive force action against the deputy who tased her. The Eleventh Circuit held that "[t]he nature and quality of the intrusion here, namely use of a taser, was appropriate given the countervailing government interest of safety and compliance." *Id.* at 1306. Namely, the arrestee refused to comply with the deputy's warning to stop her "violent" and "aggressive" behavior, and she was "clearly a danger to

18

herself and others." *Id.*  There was, thus, no genuine issue with respect to the § 1983 excessive force claim.  *Id.*

On the other hand, in *Vinyard*, the Eleventh Circuit held that the discharge of pepper spray (arguably analogous to the use of a taser) raised a jury issue on an excessive force claim.  In that case, the plaintiff was handcuffed and screaming in the backseat of a patrol car behind a screen when the officer stopped the patrol car, forcibly grabbed the plaintiff, and sprayed the plaintiff with pepper spray.  311 F.3d at 1343-44, 1347.  The Eleventh Circuit held that "using pepper spray is excessive force in cases where the crime is a minor infraction, the arrestee surrenders, is secured, and is not acting violently, and there is no threat to the officers or anyone else."  *Id.* at 1348; *see also Oliver*, 586 F.3d at 905-08 (allowing an excessive force claim brought by survivors to proceed where an officer repeatedly tased a mentally unstable man, who was not suspected of a crime, posed no immediate threat to the officers or others, and did not resist the officers); *Slicker*, 215 F.3d at 1233 (Evidence that officers "repeatedly hit [the plaintiff's] head on the pavement, kicked him, and knocked him unconscious" after he was handcuffed and not struggling with the officers "raise[d] a question of fact as to whether the officers' actions constituted excessive force and not *de minimis* force.").  In short, Eleventh Circuit cases are clear that "gratuitous use of force when a criminal suspect is not resisting arrest constitutes excessive force." *Hadley*, 526 F.3d at 1330 (An officer's "blow to the [the plaintiff's] stomach" was excessive force where the plaintiff was handcuffed and not resisting arrest.).

Here, Defendants contend that Officer Schulmerich's use of the taser gun was not excessive because Ms. Borton was unruly, uncooperative and combative. To the contrary, Ms. Borton maintains that Officer Schulmerich's use of the taser was unnecessary and excessive given that she was handcuffed and in foot restraints, not under arrest, and no longer a threat to herself or to the third parties. Under Ms. Borton's version of the facts, the court cannot conclude, as a matter of law, that the force used by Officer Schulmerich was constitutionally permissible.

The factors outlined in *Graham* and *Hadley* must be weighed based upon Ms. Borton's account of the tasing, not the officers', *see supra* note 1. First, as to the severity of the crime, there was no crime.[16] Midland City police officers and medical personnel were dispatched to Ms. Borton's house, not based upon suspected criminal activity or for the purpose of making an arrest, but rather based upon a call from a family member who was concerned about Ms. Borton's mental health and safety. While Officers Schulmerich and Weed testified they could have charged Ms. Borton with harassment or disorderly conduct, in violation of a state law, it is undisputed that Ms. Borton was not charged with any crime on the day in question.

Second, all three times when Ms. Borton was tased, she was lying face down, with her feet and arms secured to a gurney. There is no evidence that, while Ms. Borton was restrained on the gurney, she posed a threat of bodily harm to herself, to the officers or to

---

[16] Officer Schulmerich effectively concedes this much, given that he has emphasized that he responded on the scene in his role as a community caretaker. (Defs. Summ. J. Br. 29-30.)

third parties.  By this point, she was completely physically restrained, not dangerous, and outnumbered.  All she really was able to do on the gurney was scream.  These facts are at odds with to those in *Mann*, notwithstanding that the arrestee in *Mann* was in handcuffs and shackles when tased.  Those restraints did not prevent the arrestee from shattering a patrol car window, damaging the door frame, slamming her head against the door, and catapulting herself out the patrol car door.  *See* 588 F.3d at 1300.  The arrestee's unyielding, violent behavior put her physical well being in substantial jeopardy (and, in fact, resulted in injury to herself) and placed the officers in physical danger.  *See id.*

Third, while Ms. Borton put up a fight and tried to escape from the officers and ambulance personnel who were there to help her, that resistance occurred at her home and in the ambulance, not at the hospital.  Because she was tied down on a gurney, she was not a flight risk and she was incapable of physically fighting with the officers, unlike in *Draper*, where a single use of a taser was employed to effectuate an arrest of an *unrestrained*, aggressive and noncompliant suspect.  *See* 369 F.3d at 1278.

Fourth, as to the extent of the injury, Ms. Borton testified that her injuries extend beyond soreness and bruising.  (Medical Records (Ex. 7 to Doc. No. 67).)  She says that the force of the third tasing knocked her unconscious and left a permanent red scar on the end of her nose.  (Pl. Dep. 84, 152.)  The photographs of Ms. Borton's face support her contention, and there is further evidence of lingering psychological consequences.  (Pl. Dep. 107.)

Fifth, on Ms. Borton's facts, the only conceivable purpose for the three tasings would have been to silence Ms. Borton's screams, as there is no evidence that at this point she was able to actively resist or injure herself or others.  Accordingly, a reasonable jury could find that there was no need to use any force on Ms. Borton.  *See Lee*, 284 F.3d at 1198 (Where the plaintiff's crime was insignificant (honking a car horn on a busy downtown street), and the plaintiff neither posed a threat nor attempted to flee arrest, the Eleventh Circuit could "discern no reason, let alone any legitimate law enforcement need, for [the officer] to have led [the plaintiff] to the back of her car and slammed her head against the trunk *after* she was arrested and secured in handcuffs.").

Sixth, there are ample facts from which a jury could conclude that the force was not applied in good faith, but rather maliciously for the purpose of inflicting pain.  For one, as stated, there was arguably no need for any force given that Ms. Borton was restrained.  For another, one tasing allegedly lasted well over a minute (Pl. Dep. 34), which is more than twelve times the automatic five-second cycle, and the shock and pain of that tasing equated electrocution in Ms. Borton's mind.   (Pl. Dep. 34, 36.)  And, the electric shock of another tasing left a scar on Ms. Borton's face, and was inflicted in an area prohibited by the Dothan Police Department's regulations on the use of the taser.  (Procedural General Order No. 107 (Ex. to Etress Aff.) ("Officers shall not intentionally aim a TASER at a suspect's head, unless deadly force is justified.").)

Having weighed the relevant factors in light of the summary judgment facts, the court finds that a reasonable jury could conclude that tasing a mentally unstable patient three times

22

– once for more than a minute and another on the face, while her arms and legs were restrained on a gurney with handcuffs and Posey restraints – constituted an amount of force that was objectively unreasonable. The totality of the circumstances analysis compels this conclusion.

On these facts, the court rejects Officer Schulmerich's additional argument that summary judgment is proper because his use of a taser to drive stun Ms. Borton constituted *de minimis* force, and resulted in *de minimis* injury. (Defs. Summ. J. Br. 28-29.) It is true that the "application of *de minimis force*, without more, will not support a claim for excessive force in violation of the Fourth Amendment." *Nolin v. Isbell*, 207 F.3d 1253, 1257 (11th Cir. 2000); *see also Gold v. City of Miami*, 121 F.3d 1442, 1446 (11th Cir. 1997) ("[T]he minor nature of [an] injury [can] reflect[] that minimal force was used."); *McCall v. Crosthwait*, 590 F. Supp. 2d 1337, 1342-44 (M.D. Ala. 2008) (collecting *de minimis* force/injury cases), *aff'd*, 336 F. App'x 871 (11th Cir. 2009). However, *Nolin*, the sole case relied upon by Officer Schulmerich, is distinguishable. *See* 207 F.3d at 1254. In *Nolin*, where "a minimal amount of force and injury" defeated an excessive force claim on qualified immunity grounds, the plaintiff was under lawful arrest when the officer "grabbed" and shoved him several feet into a van, kneed him in the back, and pushed his head into the side of a van, *id.* at 1255, and the plaintiff sustained only temporary bruising that "quickly disappeared" without medical treatment, *id.* at 1258 n.4. Moreover, in *Nolin*, unlike here, the alleged excessive force occurred prior to the plaintiff being handcuffed. In short, on Ms. Borton's version of facts (as opposed to Officer Schulmerich's version), Officer Schulmerich's

argument that the use of force was *de minimis* in terms of both force and injury is unpersuasive.

Finally, Officer Schulmerich argues that he was dispatched to SAMC in his role as a community caretaker and that, therefore, he did not need probable cause that Ms. Borton had committed a crime to "employ[] reasonable force necessary to control the situation." (Defs. Summ. J. Br. 29-30); *see, e.g., United States v. McGough*, 412 F.3d 1232, 1233 (11th Cir. 2005) (assuming, without deciding, that there is a community caretaking exception to the Fourth Amendment's warrant requirement); *see also Cannon v. State*, 601 So. 2d 1112, 1115 (Ala. Crim. App. 1992) (recognizing that police perform a "community caretaking function" separate and apart from the enforcement of criminal statutes). Here, there are genuine issues of material fact as to whether the force was reasonable, and Officer Schulmerich has cited no case, and none has been found, that provides that the community caretaker function permits the use of excessive force.

In sum, Defendants' version of the facts and Ms. Borton's version are directly at odds on the salient points surrounding the tasing. While it may be that the trial facts turn out differently than the summary judgment facts, the foregoing cases demonstrate that on Ms. Borton's facts, she has raised a genuine issue of fact as to whether Officer Schulmerich used excessive force when he tased her three times while she was face down on a gurney, with her wrists and ankles restrained.

24

ii.     **Officer Weed**

Ms. Borton alleges that Officer Weed is liable for failing to intervene and prevent Officer Schulmerich's unconstitutional use of the taser.  (Am. Compl. ¶ 37; Pretrial Order 5.) "[I]f a police officer, whether supervisory or not, fails or refuses to intervene when a constitutional violation such as an unprovoked beating takes place in his presence, the officer is directly liable."  *Priester v. City of Riviera Beach, Fla.*, 208 F.3d 919, 924 (11th Cir. 2000).

Officer Weed argues that because Officer Schulmerich's use of the taser to drive stun Ms. Borton was not excessive force, there is no underlying constitutional violation on Officer Schulmerich's part and, thus, he (Officer Weed) also is entitled to summary judgment.  (Defs. Summ. J. Br. 23-34.)  As discussed above, there is a genuine issue of material fact with respect to the use of excessive force by Officer Schulmerich.  For this reason, Officer Weed is not entitled to summary judgment on Ms. Borton's claim for failing to stop a constitutional violation.[17]

---

[17] Officer Weed did not argue in the alternative that assuming an excessive force violation by Officer Schulmerich on Ms. Borton's version of the facts, he still would not be liable for failing to stop Officer Schulmerich from tasing Ms. Borton.  While evidence appears to be lacking that Officer Weed could have anticipated and then prevented the first tasing, given that Ms. Borton testified that Officer Schulmerich gave no warning that he was about to tase her, it is questionable whether the same conclusion could be reached as to the second and third tasings, as reported by Ms. Borton.  Because the argument was not raised, however, it is unnecessary to resolve it.

### b. Clearly Established

Having found sufficient evidence of excessive force on the part of Officer Schulmerich, the court addresses the second prong of the qualified immunity inquiry concerning whether the constitutional right was clearly established at the time of the tasing. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001); *see also Hope v. Pelzer*, 536 U.S. 730, 741 (2002) ("[T]he salient question . . . is whether the state of the law . . . gave [the officers] fair warning that their alleged treatment of [the plaintiff] was unconstitutional.").

Based upon the authority cited in the preceding subsection, the court finds that Officer Schulmerich had fair warning. Three unprovoked tasings on a mentally disturbed patient, who is not under arrest and who has been secured face down on a gurney with handcuffs and Posey restraints, amount to excessive force in violation of the Fourth Amendment. On these facts, no particularized preexisting case law is needed for it to be clearly established that Officer Schulmerich's tasing of Ms. Borton violated her Fourth Amendment right to be free from the use of excessive force. Thus, Officer Schulmerich had fair warning that his conduct violated the Constitution. Moreover, because Officer Weed's only argument is that there was no underlying constitutional violation, *see supra* note 17, he also has not presented a basis

that would entitle him to qualified immunity.  Qualified immunity is, therefore, inappropriate as to both Officer Schulmerich and Officer Weed on the summary judgment facts.[18]

### 2.      *The City (Counts III and VIII)*[19]

Because sufficient evidence of a Fourth Amendment excessive force violation has been found, the next issue is whether the City can be held liable for that violation.  Ms. Borton alleges that the City maintained a custom or policy of inadequately investigating citizens' complaints about police misconduct.  She further avers that the City failed to adequately train its police officers in the proper use of force concerning mentally impaired individuals, and failed to properly supervise abusive officers.  These grounds serve as the basis for § 1983 liability against the City.  The City argues that none of these grounds can hurdle summary judgment.

### a.      Failure to Investigate Adequately Citizens' Complaints

The City contends that summary judgment is warranted on this claim because it has presented evidence that all citizens' complaints are adequately investigated through its Internal Affairs Division and that there is no competent evidence that even one citizen's complaint regarding police misconduct was not investigated. (Defs. Summ. J. Br. 9-10.) The

---

[18] If the evidence at trial is different from the evidence presently taken in the light most favorable to Ms. Borton, Officers Schulmerich and Weed may raise qualified immunity anew at trial in motions for judgment as a matter of law, and the issue will be revisited.

[19] Ms. Borton brings § 1983 claims against the City and Powell in his official capacity as the former chief of police.  Mr. Powell is not sued in his individual capacity.  The Eleventh Circuit has held that suits against a municipal officer in his or her official capacity and suits against the municipality itself are functionally equivalent.  *See Snow v. City of Citronelle, Ala.*, 420 F.3d 1262, 1270 (11th Cir. 2005). Ms. Borton's claims, thus, need only be addressed in relation to the City.  *See id.*

City further maintains that Ms. Borton "has not shown how a failure to investigate citizens' complaints had a causal link between this alleged policy and the injury she complain[s] of." (Defs. Summ. J. Br. 10.)

The City undisputedly has a policy – even if unwritten – of investigating citizen complaints concerning police misconduct that provides for discipline of police officers where appropriate.[20] Ms. Borton alleges, however, that this policy resulted in a practice of inadequate investigations of excessive force complaints against officers. As Ms. Borton surmises, the City has a practice of not interviewing the offending officer or the complaining citizen, but instead only "favorable witnesses." (Pl. Summ. J. Resp. 8.) The investigations, in her opinion, are "superficial." (Pl. Summ. J. Resp. 7.) Although not clearly articulated, Ms. Borton appears to argue that, if the City more thoroughly investigated complaints of police misconduct, it would have learned of a pattern of excessive force by its officers that, if remedied, would have prevented her constitutional injury.

For the reasons to follow, Ms. Borton's claim falters based upon evidentiary deficiencies and a failure to satisfy the legal elements. To establish § 1983 liability against the City, Ms. Borton relies on two prior alleged complaints of excessive force against officers that she contends were inadequately investigated. The first complaint arises from Rebecca Nelson's ("Nelson") tasing in 2004 by a City police officer. (Etress Aff. 3.) However, Ms. Nelson's "statement," submitted by Ms. Borton as evidence of a prior incident of police

---

[20] An officially promulgated written policy, if there is one, is not part of the record.

brutality inadequately investigated, is unsigned and unverified (Pl. Ex. 6); it is not proper summary judgment evidence and, thus, cannot be credited. Regardless, Ms. Nelson's statement does not contain any discussion of the City's investigation of her allegations. Ms. Borton has submitted no other evidence to cure this deficiency. Her testimony that Ms. Nelson's complaint was not adequately investigated (Pl. Dep. 65-66) is cursory, conclusory and lacks any foundation showing personal knowledge. Juxtaposed with this lack of evidence is the competent evidence that, after Ms. Nelson filed a damages claim with the City's clerk in June 2005, the Dothan Police Department's Internal Affairs Division conducted an investigation and found the use of force justified. (Etress Aff. 3.) This evidence stands unrefuted, and there simply is no evidence to back up Ms. Borton's claim that this complaint was not adequately investigated.

The second prior complaint relied upon by Ms. Borton is one lodged against Officer Schulmerich in 1999 involving excessive force. (Pl. Summ. J. Resp. 8.) The evidence submitted by Defendants fairly indicates that the complaint was promptly investigated by the Internal Affairs Division, but that the investigation found that the complaint was not meritorious. (Etress Aff. 3-4.) Ms. Borton argues, however, that the investigation was inadequate because Officer Schulmerich testified during his deposition that he was not aware that any other complaint of excessive force had been filed against him, implying that he neither was told of or interviewed during the 1999 investigation. (Pl. Summ. J. Resp. 8 (Schulmerich Dep. 42-43).)

29

Initially, it should be emphasized that Ms. Borton does not assert that the City failed to conduct any investigation at all of this complaint of excessive force. Rather, Ms. Borton critiques the adequacy or quality of the investigation that was conducted. The Eleventh Circuit has found facts supporting § 1983 municipal liability where there was a *total failure* of a law enforcement agency to investigate citizens' complaints of police brutality. *See Vineyard*, 990 F.2d at 1212-13; *see also Gold*, 151 F.3d at 1353 (discussing *Vineyard*). Ms. Borton cites *Gold*, but she does not cite any decision, much less a binding one, that addresses § 1983 liability based upon inadequate investigations of complaints of police misconduct as opposed to nonexistent investigations. Further probing of the law and independent research on this issue are not required, however, because there is no evidence that any alleged practice of inadequate investigations was the "moving force" or cause of Ms. Borton's constitutional violation. *Vineyard*, 990 F.2d at 1213.

*Brooks v. Scheib*, 813 F.2d 1191 (11th Cir. 1987), which involved the City of Atlanta's "procedures for investigating citizens' complaints against police officers," is instructive. *Id.* at 1192. In *Brooks*, cited by Defendants, the plaintiff brought a § 1983 custom or policy claim against the city, arguing that citizens should be given a role in reviewing police misconduct complaints. Observing that "[t]he federal judiciary should avoid limiting the discretion of state and local governments by dictating specific remedial measures," the Eleventh Circuit questioned in the first instance whether a "failure to adopt a specific procedure can fall within the *Monell* definition of custom or policy." *Id.* at 1194 n.4. Nonetheless, assuming the validity of such a claim, the Eleventh Circuit held that the

30

plaintiff failed "to establish the causal element – the 'affirmative link' between the procedures for investigating citizens' complaints and [the officer's] deprivation of [the plaintiff's] constitutional rights – necessary to prove a section 1983 claim." *Id.* at 1195.  In particular, the plaintiff "was obligated" but failed "to produce some evidence that the complaints against [the defendant-officer] had some merit and that more effective citizens' complaint procedures would have prevented his injuries."  *Id.*; *see also Gold*, 151 F.3d at 1353 ("[B]ecause [the plaintiff] presented no evidence of a prior false arrest for disorderly conduct or even a valid complaint of such false arrest, there is no showing that the City's procedures for handling false arrest complaints affected the officers' conduct here." (citing *Brooks*, 813 F.2d at 1195)).

Here, it is simply Ms. Borton's own opinion, unsupported by any evidence, that Officer Schulmerich should have been interviewed in 1999 as part of the investigation, and that the failure to interview him, if that is what occurred, led to her injuries.  She has presented no evidence that the absence of additional or different procedures pertaining to witness interviews would have improved the investigative procedures or, assuming *arguendo* deficient investigative procedures, that different procedures would have forestalled her constitutional injuries.  Causation also is lacking because Ms. Borton has not submitted any evidence that the 1999 complaint against Officer Schulmerich actually had merit.

Ms. Borton, thus, is left with her criticism of the investigation conducted after her sister filed a complaint on her behalf complaining about Officer Schulmerich's tasing.  (Pl. Summ. J. Resp. 6-7.)  Corporal Draughon, a seasoned veteran of the Dothan Police

31

Department, investigated the complaint against Officer Schulmerich.  The uncontroverted parts of his affidavit establish that he interviewed not only Ms. Borton, but also the on-duty nurses, and the paramedics who brought her to the hospital.  (Draughon Aff. 1-3.)  Ms. Borton contends, however, that the investigation was inadequate because Ms. Whitfield was not interviewed.  (Pl. Summ. J. Resp. 6.)  While it perhaps can be argued successfully on the summary judgment facts that the wrong conclusion was reached, Ms. Borton's arguments as to whom she contends should have been interviewed during the investigation are not persuasive on the issue of the City's liability.  For one, Ms. Borton has not explained, and it is difficult to envision, how the failure to interview Ms. Whitfield puts at issue the adequacy of the City's investigative procedures, particularly given that Ms. Whitfield testified that she did not witness any of the three tasings about which Ms. Borton complains. (Whitfield Dep. 29, 63, 73.)  For another, this is but a single incident, *see Wideman*, 826 F.2d at 1032.  Last but not least, Ms. Borton has not articulated how an inadequate investigation occurring *after* the constitutional violation at issue, could have caused that violation.  *See Fox v. Van Oosterum*, 987 F. Supp. 597, 604 (W.D. Mich. 1997) (explaining that the argument that a decision not to investigate, made after alleged violation took place, somehow caused that violation, "defies logic"), *aff'd*, 176 F.3d 342 (1999).

Because the record is devoid of any evidence demonstrating a policy or custom of inadequate investigation of citizens' complaints that caused her constitutional injuries, Ms. Borton cannot establish § 1983 liability on behalf of the City.  The summary judgment motion will be granted on this claim.

32

### b.    Failure to Train

Ms. Borton argues that the City had a policy or custom of inadequately training its police officers.  More specifically, Ms. Borton contends that the training is inadequate because the Dothan Police Department provides "no training in how to handle mental patients, or any special restraining techniques for holding such people without injury."[21] (Pl. Summ. J. Resp. 9 (citing Schulmerich Dep. 26; Blissett Dep. 38).)

"A city may only be held liable under 42 U.S.C. § 1983 when the injury caused was a result of municipal policy or custom."  *Lewis v. City of W. Palm Beach, Fla.*, 561 F.3d 1288, 1293 (11th Cir. 2009).  This "may include a failure to provide adequate training if the deficiency 'evidences a deliberate indifference to the rights of [the city's] inhabitants.'"  *Id.* (quoting *City of Canton v. Harris*, 489 U.S. 378, 385 (1989)).  When a failure to train is at issue, a plaintiff must "'present some evidence that the municipality knew of a need to train . . . in a particular area and the municipality made a deliberate choice not to take any action.'" *Gilliam ex rel. Waldroup v. City of Prattville*, 667 F. Supp. 2d 1276, 1292 (M.D. Ala. 2009) (quoting *Gold*, 151 F.3d at 1350).  This requirement is "intentionally onerous" to avoid permitting a municipality to suffer *respondeat superior* liability.  *Gold*, 151 F.3d at 1351 n.10.  Notice may be established in two ways.  "First, if the city is aware that a pattern of

---

[21] The theory for the § 1983 failure-to-train claim, as argued in Ms. Borton's brief, is different from the theory alleged in the Amended Complaint.  The Amended Complaint alleges that the City provided inadequate training for officers who are guilty of "police misconduct."  (Am. Compl. ¶ 66.)  The theory relied upon in the Amended Complaint is deemed abandoned (but, in any event, there is no evidence to support it).  For the sake of thoroughness, and because it was incorporated in Ms. Borton's contentions in the Pretrial Order without objection (Pretrial Order 8), the theory argued in Ms. Borton's brief will be addressed.

constitutional violations exists, and nevertheless fails to provide adequate training, it is considered to be deliberately indifferent."  *Lewis*, 561 F.3d at 1293.  Second, "deliberate indifference may be proven without evidence of prior incidents, if the likelihood for constitutional violation is so high that the need for training would be obvious."  *Id.*

Here, Ms. Borton has not submitted evidence of, or argued that there is, a  pattern of occurrences where police officers employed excessive force in restraining "mental patients" in a similar manner as in this case.  (Pl. Summ. J. Resp. 9.)  Rather, Ms. Borton argues that "[h]andling citizens in an altered mental state is something that should be expected and foreseen by the City" and that, therefore, training should have been provided on this subject.  (Pl. Summ. J. Resp. 10.)  The City contends, on the other hand, that Ms. Borton "cannot establish that the lack of training in this specific area of restraining a mental patient was so likely to cause a constitutional violation that the need for the special training was obvious." (Defs. Reply Br. 7; *see also* Defs. Summ. J. Br. 11-13.)  For the reasons to follow, the "obvious need" test is not met on this record.

There must be a "'glaring omission,'" not merely an "'imperfection[ ],'" in the training program.  *Gold*, 151 F.3d at 1352 (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 410 (1997)).  As observed by another judge of this court, the Supreme Court "in dictum, has given only one example of a need to train being 'so obvious' that a municipality could be liable without a pattern of constitutional violations," and that example is failing to train police officers in the use of deadly firearm force.  *Gilliam*, 667 F. Supp. 2d at 1292 (citing *City of Canton*, 489 U.S. at 390); *accord Gold*, 151 F.3d at 1352

34

(observing that in *City of Canton* the example cited was the "obvious need to train police officers on the constitutional limitations on the use of deadly force, when the city provides the officers with firearms and knows the officers will be required to arrest fleeing felons"). The Eleventh Circuit has repeatedly rejected attempts to extend failure-to-train liability to other law-enforcement situations, such as the use of "hobble" restraints, *Lewis*, 561 F.3d at 1293, responding to complaints about the use of handcuffs, *Gold*, 151 F.3d at 1352, and the identification and treatment of mentally ill inmates by jail staff, *see Young v. City of Augusta, Ga.*, 59 F.3d 1160, 1171-72 (11th Cir. 1995).  *See also Gilliam*, 667 F. Supp. 2d at 1293 ("The City's failure to re-train its officers on the use of their tasers every year is not a 'particularly glaring omission' because the use of a taser is distinguishable from the use of a firearm in the Supreme Court's sole hypothetical example.").

Based upon the Eleventh Circuit's clear reluctance to extend failure-to-train liability to the situations above, an extension of the failure-to-train liability to including training on proper techniques to restrain mentally impaired individuals is not justified.  Indeed, Ms. Borton cites no case that holds, or even discusses, a constitutional claim against a municipality for similar conduct.

### c.    Failure to Supervise

The City argues that the failure-to-supervise claim fails because it is predicated solely on Officer Schulmerich's tasings of Ms. Borton on August 15, 2006, and that this single incident is insufficient to hold the City liable under § 1983.  (Defs. Summ. J. Br. 13-14 (citing Pl. Dep. 69).)  In any event, the City contends that the Dothan Police Department has in place numerous mechanisms to oversee its officers, including extensive training for its officers, annual evaluations with repercussions for negative performance, a "military style chain of command," and an Internal Affairs Division for investigating complaints of police misconduct, and that Ms. Borton has not "present[ed] any evidence . . . that the City had a policy or custom of failing to supervise its officers."  (Defs. Summ. J. Br. 13-15.)  Ms. Borton's only rebuttal is that the City's alleged inadequate investigation of citizens' complaints concerning excessive force by officers "allows [them] to overstep their boundaries and violate the civil rights of citizens without fear of any disciplinary action." (Pl. Summ. J. Resp. 10.)

A failure-to-supervise claim is closely akin to a failure-to-train claim.  A plaintiff may prove that a failure to supervise is a city policy by demonstrating that the city's failure "evidenced a 'deliberate indifference' to the right of its inhabitants." *Gold*, 151 F.3d at 1350. Deliberate indifference requires proof that "the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action." *Id.*  "[W]ithout notice of a need to train or supervise in a particular area, a

municipality is not liable as a matter of law for any failure to train and supervise." *Id.* at 1351.

Ms. Borton's argument directly and expressly ties her failure-to-supervise claim to her contention that the City has a custom or policy of inadequately investigating citizens' complaints. Because the latter claim failed, it necessarily follows that the former fails as well. Ms. Borton makes no other argument, and as discussed in other parts of this opinion, there is no evidence that the City knew of a prior substantiated complaint of excessive force by one of its officers or knew of a prior incident in which an individual's constitutional right to be free from excessive force was violated. In light of the evidence submitted by Defendants as to supervisory mechanisms, and given Ms. Borton's cursory treatment of her claim, without citation to any convincing evidence, there is insufficient evidence to raise a genuine issue of material fact. Summary judgment, therefore, is due to be entered in favor of the City on Ms. Borton's § 1983 failure-to-supervise claim against the City.

### d.   A Word About Count VIII as Pertains to the City

Although the source of law relied upon by Ms. Borton in Count VIII is not crystal clear, Defendants have characterized it as a Fourth Amendment excessive force claim, and Ms. Borton has not refuted that characterization. Although the City is named in this count (alongside Officer Schulmerich and Officer Weed), it contains no allegations that a municipal custom or policy caused Ms. Borton's constitutional rights to be violated. Because under § 1983 a municipality cannot be held liable for the individual actions of its officers on the basis of *respondeat superior*, Count VIII presents no potentially viable theory of liability

37

against the City. In other words, all of Ms. Borton's allegations pertaining to customs or policies of the City are set forth in Count III; there are none in Count VIII.

## B.   State Law Claims

### 1.   State Law Claims Against the City and Chief of Police Powell in his Official Capacity

#### a.   Negligent Retention (Count VI)

Ms. Borton concedes that summary judgment is appropriate as to her state law negligent retention claim. (Pl. Summ. J. Resp. 12.) Based upon this concession, Defendants' motion is due to be granted on this cause of action.

#### b.   Negligent Training and Supervision (Counts IV and V)

Ms. Borton alleges that the City of Dothan, through its former chief of police (Powell), negligently and wantonly failed to train and supervise its officers (including Officers Schulmerich and Ward) with respect to the "proper use" of a taser. (Am. Compl. ¶¶ 78, 88.) The City argues that by statute, it cannot be held liable for wanton conduct, and that under case law, there is no "cause of action against a municipality for negligent . . . supervision or training." (Defs. Summ. J. Br. 16-17.) Ms. Borton merely responds that, even if the court dismisses the wantonness claims, the City "can still be held responsible for the negligent [training and] supervision of its employees." (Pl. Summ. J. Resp. 11.) The City has the better argument.

First, § 11-47-190 of the Alabama Code limits the liability of a city. That statute provides in, pertinent part, that

38

> [n]o city or town shall be liable for damages for injury done to or wrong
> suffered by any person or corporation, unless such injury or wrong was done
> or suffered through the neglect, carelessness, or unskillfulness of some agent,
> officer, or employee of the municipality engaged in work therefor and while
> acting in the line of his or her duty . . . ."

Ala. Code § 11-47-190. The Supreme Court of Alabama has held that § 11-47-190

"exclude[s] liability for wanton misconduct" attributable to a city within Alabama's

boundaries. *Town of Loxley v. Coleman*, 720 So. 2d 907, 909 (Ala. 1998) (quoting *Hilliard*

*v. City of Huntsville*, 585 So. 2d 889, 891 (Ala. 1991)). Based upon this clear authority and

Ms. Borton's failure to offer any substantive argument to the contrary, the City is entitled to

summary judgment on Ms. Borton's claim against it alleging wanton training and

supervision.

Second, as this court previously has observed, no Alabama court has expressly

recognized a cause of action against a municipality for a supervisor's negligent training or

supervision of a subordinate. *Cornelius v. City of Andalusia*, No. 06cv312, 2007 WL

4224036, at *5 (M.D. Ala. Nov. 28, 2007) (citing *Ott v. City of Mobile*, 169 F. Supp. 2d

1301, 1314-15 (S.D. Ala. 2001)); *see also Styron v. City of Foley*, No. 03-0572, 2005 WL

3098926, at *4-5 (S.D. Ala. Nov. 18, 2005). Ms. Borton has not cited any authority from any

state or federal court contradicting or rejecting the finding in *Ott*. The court also has not

located any such authority. *Accord Ott,* 169 F. Supp. 2d at 1314 ("The plaintiffs have

identified, and the Court has located, no authority for the proposition that such a cause of

action exists."). To the contrary, other federal district courts in Alabama have followed in

*Ott*'s footsteps. *See Hamilton v. City of Jackson*, 508 F. Supp. 2d 1045, 1057-58 (S.D. Ala.

2007) (Police chief could not be liable for negligent training or supervision because, as explained in *Ott*, "no such cause of action exists under Alabama law" and, therefore, the claim also could not proceed against the city "since its liability, if any, flows derivatively from its employee."); *McLaurine v. City of Auburn, Ala.*, No. 06cv1014, 2007 WL 1548924, at*3 n.5 (M.D. Ala. 2007) (adopting magistrate judge's recommendation that favorably cited *Ott*). Accordingly, Ms. Borton has not demonstrated that Alabama law recognizes her cause of action for negligent training and supervision against the City, and the weight of authority does not support her claim.

However, assuming the validity of the claim under Alabama law, the negligent supervision and training claim would fail on the merits. An essential element of this claim requires "affirmative proof" that the employee's incompetence was actually or constructively known by the master. *Voyager Ins. Cos. v. Whitson*, 867 So. 2d 1065, 1073 (Ala. 2003). Defendants have submitted evidence that Officers Schulmerich and Weed were certified to carry tasers, had maintained mandatory annual training, and had favorable evaluations. There also is no evidence, as discussed earlier, that a meritorious claim of excessive force has been previously filed against these officers. Ms. Borton has not identified any competing evidence from which the City's awareness can be inferred. Accordingly, summary judgment on Ms. Borton's state law claim against the City for negligent training and supervision is due to be entered in favor of the City.

>  2.  *State Law Claims Against Officers Schulmerich and Weed*
>
>  a.   **Assault and Battery**

An assault and battery claim under Alabama law is brought against Officer Schulmerich and Officer Weed.  The elements of assault and battery are an "'intentional, unlawful offer to touch the person of another in [a] rude or angry manner under such circumstances as to create in the mind of the party alleging the assault a wellfounded fear of an imminent battery, coupled with the apparent present ability to effectuate the attempt if not prevented.'"  *Ex parte Am. Heritage Life Ins. Co.*, No. 1080868, 2010 WL 1170513, *2 (Ala. March 26, 2010) (published) (quoting *Wright v. Wright*, 654 So. 2d 542, 544 (Ala.1995)). A battery is a "successful assault" and requires a touching in a "hostile manner."  *Surrency v. Harbison*, 489 So. 2d 1097, 1104 (Ala. 1986); *see also Ex parte Atmore Cmty. Hosp.*, 719 So. 2d 1190, 1193 (Ala. 1998) (defining a battery as an intentional touching "conducted in a harmful or offensive manner").  Moreover, under appropriate circumstances, one need not have personally committed the assault and battery to be held liable alongside the actual tortfeasor.  In *Abney v. Mize*, 46 So. 230 (1908), the Supreme Court of Alabama approved a jury instruction that "if Ben Abney aided, abetted, or encouraged Dee Abney in entering into or continuing an unlawful assault on plaintiff, then he would be responsible for whatever Dee Abney did in the furtherance of such assault, notwithstanding that he may not have explicitly encouraged, aided, or abetted any one particular act of defendant Dee Abney."  *Id.* at 230; *see also Deal ex rel. Barber v. Hill*, 619 So. 2d 1347, 1349 (Ala. 1993) (citing *Abney* with approval).

41

### i.      Officer Schulmerich

Officer Schulmerich contends that on his version facts – two tasings by him for the purpose of controlling an uncontainable, unrestrained and hysterical mentally disturbed patient – is lawful, and not an assault and battery.  (Defs. Summ. J. Br. 34-35.)  On Ms. Borton's facts, however, a reasonable jury could conclude that three unprovoked tasings on a patient secured to a gurney with no possibility of escape or harming herself or others amount to assault and battery.  Because the evidence as to whether an assault and a battery in fact occurred is conflicting, the question as to the lawfulness of the tasings under Alabama's assault and battery law is for the jury.

### ii.      Officer Weed

The factual basis for holding Officer Weed liable for assault and battery is that he "took no action to stop" Officer Schulmerich from tasing Ms. Borton and that he "threatened [Ms. Borton] with further physical harm while assisting Officer Schulmerich." (Am. Compl. ¶ 48.)  As to the former, because the only basis argued by Officer Weed for summary judgment is that Officer Schulmerich's tasing of Ms. Borton was neither an assault nor a battery, he also has not presented grounds that warrant the grant of summary judgment.  As to the latter, it would appear that Ms. Borton is referring to her testimony that, while in the SAMC examination room, Officer Weed for "no reason" said that if she "spit on him," he would "knock [her] out," and he "drew his fist back . . . over his head."  (Pl. Dep. 39.) Officer Weed, however, has not addressed this arguably independent ground for assault, and, thus, summary judgment is not appropriate on this claim either.

###### b.     State-Agent Immunity

Officers Schulmerich and Weed nonetheless contend that they are entitled to state-agent immunity in their individual capacities.[22]   (Defs. Summ. J. Br. 35-37; Pl. Summ. J. Resp. 12.)  State-agent immunity is extended to police officers when a tort claim is based on "exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers' arresting or attempting to arrest persons," *or serving as peace officers under circumstances entitling such officers to immunity pursuant to § 6-5-338(a), Ala. Code 1975.*"  *Hollis v. City of Brighton*, 950 So. 2d 300, 309 (Ala. 2006) (emphasis in original).  The test for state-agent immunity is "set forth in *Ex parte Cranman*, 792 So. 2d 392 (Ala. 2000), as modified in *Hollis*," which "incorporat[ed] the peace-officer-immunity standard provided in § 6-5-338(a) into the State-agent-immunity analysis found in *Cranman*."  *Suttles v. Roy*, No.1071453, 2010 WL 2034827, *3 (Ala. 2010) (published).

State-agent immunity is subject to a burden-shifting framework.  The police officer bears the burden of demonstrating that the plaintiff's claims arise from a function that would give rise to immunity.  *See Brown v. City of Huntsville, Ala.*, 608 F.3d 724, 741 (11th Cir. 2010) (citing *Ex parte Estate of Reynolds*, 946 So. 2d 450, 452 (Ala. 2006)).  When the police officer has shown this, the burden shifts to the plaintiff to show that the police officer

---

[22] In Alabama, there is state-agent immunity defined by case law and discretionary function immunity defined by statute.  *See Brown v. City of Huntsville, Ala.*, 608 F.3d 724, 740-41 (11th Cir. 2010).  As explained in *Brown*, the principles of state-agent immunity now govern whether a peace officer is entitled to statutory immunity.  *Id.* at 740.

"'acted willfully, maliciously, fraudulently, in bad faith, or beyond his or her authority.'" *Id.* (citing *Ex parte Estate of Reynolds*, 946 So. 2d at 452).

There appears to be no dispute that Officer Schulmerich and Officer Weed were serving as peace officers on August 15, 2006. Ms. Borton, thus, has the burden of showing that Officer Schulmerich and Officer Weed acted willfully, maliciously, fraudulently, in bad faith, or beyond their legal authority.

For substantially the same reasons that Officer Schulmerich was denied qualified immunity on the Fourth Amendment excessive force claim, he also is not entitled to state-agent immunity for that conduct. Construing the facts in the light most favorable to Ms. Borton, Officer Schulmerich's use of a taser drive stun on Ms. Borton was done intentionally, gratuitously, and in violation of Ms. Borton's clearly established constitutional rights. *See Brown*, 608 F.3d at 742 (Police officer was not entitled to state-agent immunity when the summary judgment facts established that he sprayed pepper spray on a cooperative, non-combative, non-threatening suspect.).

Although perhaps a closer call, state-agent immunity as to Officer Weed is not appropriate at this time either. A reasonable jury could conclude on Ms. Borton's facts that Officer Weed, at the very least, acted intentionally in taking absolutely no action to prevent Officer Schulmecher from tasing Ms. Borton the second and third times, *see supra* note 17.

Of course, if at trial the facts pan out more in line with Defendants' version of the events, state-agent immunity may bar Ms. Borton's claims.[23]

## VI.  CONCLUSION

Based upon the facts viewed in the light most favorable to Ms. Borton, there is sufficient evidence that Officer Schulmerich used excessive force when he activated his taser three times on Ms. Borton while she was lying face down on a gurney with all limbs tightly secured by handcuffs and Posey restraints, and that Ms. Borton's right not to be subjected to this force was clearly established on August 15, 2006.  Moreover, because a reasonable jury could conclude that Officer Schulmerich's tasing subjects him to liability for assault and battery under Alabama law, summary judgment is due to be denied on this claim.

Furthermore, because Officer Weed (whose liability is predicated on allegations of a failure to stop Officer Schulmerich's tasing) hangs his summary judgment motion on the sole ground that Officer Schulmerich's tasing was neither excessive force, in violation of the Fourth Amendment, nor assault and battery under Alabama law, he also is not entitled to summary judgment on the Fourth Amendment excessive force claim and the state law assault and battery claim.  Summary judgment, however, is due to be entered in Defendants' favor on all other claims subject to the motion.

---

[23] The assault and battery claim also is lodged against Officers Schulmerich and Weed in their official capacities.  (Am. Compl. 13.)  In the § 1983 context, as discussed earlier, the official-capacity claim against these officers is really one against the City.  Officers Schulmerich and Weed have not raised or addressed whether the same dichotomy is recognized under Alabama law.  In other words, Officers Schulmerich and Weed have not briefed whether a claim for assault and battery against a city police officer is treated as a claim against the City and, if so, whether the City is immune from liability  Because these issues have not been raised or briefed, this opinion does not resolve them.

Accordingly, it is ORDERED that Defendants' motion for summary judgment (Doc. # 66) is GRANTED in part and DENIED in part as follows:

(1)    GRANTED as to Ms. Borton's § 1983 Fifth Amendment and Eighth Amendment claims against Officers Schulmerich and Weed in their individual capacities;

(2)    DENIED on the merits as to Ms. Borton's § 1983 Fourth Amendment excessive force claims against Officers Schulmerich and Weed in their individual capacities;

(3)    DENIED on Officer Schulmerich's and Officer Weed's defense of qualified immunity on Ms. Borton's § 1983 Fourth Amendment excessive force claims against them in their individual capacities;

(4)    DENIED on the merits on Ms. Borton's state law claim for assault and battery against Officers Schulmerich and Weed;

(5)    DENIED on Officer Schulmerich's and Officer Weed's defense of state-agent immunity on Ms. Borton's state law claim for assault and battery against them in their individual capacities; and

(6)    GRANTED as to the state law claims alleging negligent training, supervision and retention against the City and Chief of Police Powell in his official capacity.

DONE this 24th day of August, 2010.

_____/s/ W.  Keith Watkins_____
UNITED STATES DISTRICT JUDGE